IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA,    :
    :
        PLAINTIFF,    :
    :
      v.    :    CIVIL ACTION NO. 2:06cv1022-MEF

    :
ONE 2001 CHEVROLET SUBURBAN,  :
VIN: 3GNEC16TX1G165966,    :
WITH ALL APPURTENANCES    :
AND ATTACHMENTS THEREON,    :
    :
    DEFENDANT.    :

BRIEF AND MEMORANDUM OF LAW IN SUPPORT
OF THE UNITED STATES OF AMERICA'S
MOTION FOR SUMMARY JUDGMENT

The United States of America (United States), by and through Leura G. Canary, United States Attorney for the Middle District of Alabama, and John T. Harmon, Assistant United States Attorney, hereby respectfully submits the following Brief and Memorandum of Law in Support of the United States' Motion for Summary Judgment:

PRELIMINARY STATEMENT

This action arose out of a seizure of the Defendant vehicle on June 19, 2006, in the Middle District of Alabama.  On November 15, 2006, the United States filed this civil forfeiture action against the Defendant vehicle, alleging that it is subject to forfeiture under 21 U.S.C. § 881(a)(4) and 21 U.S.C. § 881(a)(6).  The United States moves for summary judgment because there is no genuine issue of material fact requiring a trial regarding the forfeiture of the Defendant vehicle.

STATEMENT OF THE CASE

A.    Administrative and Judicial Civil Forfeiture
      Proceedings.

On September 12, 2006, Taramesha Fountain filed a claim

for the Defendant vehicle with the DEA. (Attached).

B.    Facts.

The United States adopts and alleges the facts as found

in its Verified Complaint, Paragraph 5(a) through 5(l).  These

facts are sworn to and verified and the original Verification is

filed with this Court.

Verified Complaint for Forfeiture In Rem.  Paragraph

numbers 5(a) through 5(l), as follows:

a)    In March 2006, task force officers began an
investigation into Ricardo Cajero (hereinafter, Cajero) and his
drug trafficking activities.

b)    In March 2006, Cajero met with a confidential
(hereinafter, CS) and was driving a 2001 Chevrolet Suburban (the
Defendant vehicle), registered to Taramesha Fountain (hereinafter,
Fountain).

c)    The investigation revealed that Cajero was using a
residence located at 2000 Green Acres Drive, Montgomery, Alabama to
facilitate his illegal activities. A check of utilities at the
address revealed that the billed subscriber at the residence was
Fountain.  During the course of the investigation, agents were told
that Cajero was supplying Tavaris Mabson (hereinafter, Mabson) with
large amounts of marijuana and cocaine.  Mabson is a well known
drug distributor.

d)    On May 5, 2006, a search warrant was executed at
2000 Green Acres Drive.  The search warrant was obtained after
agents seized approximately 200 pounds of marijuana in a vehicle
from which Cajero fled.  The vehicle had come from 2000 Green Acres
Drive immediately before the seizure.  At the residence, agents
located and seized approximately 35 pounds of additional marijuana
and other miscellaneous items. Fountain and Mabson were both

present during the search.    Mabson is Fountain's common-law husband.

e)    In June 2006, Mabson, Fountain and Cajero were indicted by a federal grand jury for possession with intent to distribute approximately 240 pounds of marijuana, conspiracy to possess with intent to distribute over 1,000 kilograms of marijuana and possession of a firearm in furtherance of a drug trafficking offense.

f)    On June 19, 2006, agents received information from a CS that Mabson was at 2627 Lark Drive, Montgomery, Alabama. Agents were also informed that Mabson was driving the Chevrolet Suburban (the Defendant vehicle).  Agents established surveillance and executed a stop on Mabson after he left the residence.  Mabson was arrested and the Suburban was seized.

g)    The interior of the Suburban contained a strong odor of raw marijuana.    Several marijuana seeds and pieces of marijuana residue were inside the vehicle and several partially burned hand-rolled marijuana cigarettes were in the ashtray.

h)    A check of the Suburban's title history revealed that Fountain purchased the vehicle in February 2006 from Foreign Auto Car Sales.  Kenneth Gray (hereinafter, Gray) is the owner of Foreign Auto Car Sales and is also Fountain's cousin.  Gray said Fountain bought the Suburban in February by trading in a car and paying approximately $5,000 cash.  No lien is shown on the vehicle.

i)    In order to prevent law enforcement officials from discovering or seizing their assets, drug dealers often use a relative or associate (who is not connected to the drug business) as a "straw" or nominee owner.  The "straw" owner holds legal title to the property, but the true owner retains dominion and control of the property.

j)    Mabson has a history of using other individuals to make "straw purchases" of vehicles and other items.

k)    Fountain showed a reported income of $7,600.00 in the fourth quarter of 2005 and $1,900.00 in the first quarter of 2006.  No other employment records exist for Fountain.

l)    Neither Mabson nor Fountain has sufficient legal income to show a legitimate source for the funds used to purchase the Defendant vehicle.

C.   Deposition of Taramesha Fountain.

The United States specifically cites the following portions of Taramesha Fountain's deposition as supporting summary judgment.

1.   Page 29: Tavares Mabson (Mabson) is Taramesha Fountain's (Fountain) boyfriend and the father of one of her children.

2.   Pages 29-30: Mabson has pleaded guilty to federal criminal charges involving possession of controlled substances.

3.   Page 31: Fountain lived in the residence at 2000 Green Acres Drive in Montgomery, Alabama.

4.   Pages 34-37: 2000 Green Acres Drive was searched on or about May 6, 2006. Fountain was present during the search.

5.   Pages 38-39, 41 and 55-56: Marijuana was found in 2000 Green Acres Drive in the trunk of a Caprice vehicle kept in the garage. Mabson owned the Caprice but it was registered to Mabson's cousin. Fountain saw marijuana on a table in 2000 Green Acres Drive after the police had seized it. Mabson told Fountain he was sorry he had the marijuana in his car and residence.

6.   Pages 45-46: - Fountain's sister owned a 2003 Tahoe but the Tahoe was registered in Fountain's name.

7.   Pages 48-49, 56: - Fountain allowed Mabson to use the Suburban, even though he had no drivers license.

4

8.    <u>Pages 50-51</u>: Fountain was aware that Mabson smoked marijuana. She could smell it on his person.

9.    <u>Page 52</u>: Mabson always paid his share of the house expenses in cash.

10.    <u>Pages 54-55</u>: Guns were seized by police from the master bedroom she shared with Mabson.

11.    <u>Pages 57-58</u>: $4,962 in cash was seized from her 12 year old son's bedroom.

<u>ARGUMENT</u>

SUMMARY JUDGMENT SHOULD BE GRANTED
BECAUSE THERE IS NO GENUINE ISSUE OF
MATERIAL FACT REQUIRING A TRIAL

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court should render summary judgment if it concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  The party seeking summary judgment bears the initial burden of establishing "the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986) (quoting Rule 56(c)).  The "mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

5

requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."
<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-8, 106 S.Ct.
2505, 2510 (1986) (emphasis in original); <u>See also Matsushita</u>
<u>Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-
86, 106 S.Ct. 1348, 1355-56 (1986).

Summary judgment is appropriate in civil forfeitures where
this standard is met. <u>See</u>, <u>e.g.</u>, <u>United States v. One 1987 Mercedes</u>
<u>Benz 300E</u>, 820 F. Supp. 248 (E.D.Va. 1993) (granting summary
judgment to government where there was no material issue of fact).
Indeed, summary judgment may also be granted where claimant has
asserted an innocent owner defense. <u>See</u>, <u>e.g.</u>, <u>United States v.</u>
<u>One Parcel of Property Located at 755 Forest Road</u>, 985 F.2d 70 (2d
Cir. 1993) (rejecting innocent owner defense and affirming summary
judgment granted against wife of target of narcotics investigation
where narcotics and drug paraphernalia had been found in their
shared bedroom); <u>United States v. Property Located at 15 Black</u>
<u>Ledge Drive</u>, 897 F.2d 97, 103 (2d Cir. 1990) (rejecting a wife's
claim of no knowledge and affirming summary judgment); <u>see also</u>
<u>United States v. Premises Known as 717 South Woodward Street</u>, 2
F.3d 529, 533 (3d Cir. 1993) ("It is clear that a claimant's bare
denial of knowledge or consent may be insufficient to withstand
summary judgment in a forfeiture case.").

Whether there is a genuine issue of fact for trial depends on
the substantive law of the underlying case and the evidentiary

burdens that law places on each party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 252-56 (noting that "the judge must view the evidence presented through the prism of the substantive evidentiary burden"); United States v. One Parcel of Real Property, 904 F.2d 487, 490 (9th Cir. 1990); Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987).  Thus, in the instant case, the summary judgment rules must be "'construed in the light of the statutory law of forfeitures, and particularly the procedural requirements set forth therein.'" United States v. One 56-Foot Motor Yacht Named Tahuna, 702 F.2d 1276, 1281 (9th Cir. 1983) (quoting United States v. One 1975 Mercedes 280S, 590 F.2d 196, 199 (6th Cir.1978)).

The Court of Appeals for the Eleventh Circuit noted as follows:

> Under Fed.R.Civ.P 56(c), a district court should award summary judgment to the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The substantive law applicable to the case identifies which facts are material.  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

> *    *    *    *    *

> The moving party bears "the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on

7

file, together with the affidavits, if any,'
which it believes demonstrate the absence of a
genuine issue of material fact."  When the
<u>nonmoving</u> party has the burden of proof at
trial, the moving party is not required to
"support its motion with affidavits or other
similar material negating the opponent's
claim," in order to discharge this "initial
responsibility."  Instead, the moving party
simply may "`show[]'-- that is, point[] out to
the district court -- that there is a absence
of evidence to support the nonmoving party's
case."  Alternatively, the moving party may
support its motion for summary judgment with
affirmative evidence demonstrating that the
nonmoving party will be unable to prove its
case at trial.  If the moving party shows the
absence of a triable issue of fact by either
method, the burden on summary judgment shifts
to the nonmoving party, who must show that a
genuine issue remains for trial.  If the
nonmoving party fails to "make a sufficient
showing on an essential element of her case
with respect to which she has the burden of
proof," the moving party is entitled to
summary judgment.  (Cites omitted).

<u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428,
1437-1438 (11th Cir. 1991).

    B.   <u>Burden of Proof</u>.

    The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"),

Pub. L. No. 106-185, 114 Stat. 202 (2000), mandated a fundamental

change in the government's initial burden of proof in civil

forfeiture actions.  Prior to CAFRA, the United States had the

initial burden of showing probable cause for the forfeiture.  Once

the United States established probable cause, the burden shifted to

the claimant to prove, by a preponderance of the evidence, either

that there was no probable cause or that he/she was an "innocent

owner." See United States v. All Assets of G.P.S. Automotive Corp., 66 F.3d 483, 487 (2d Cir. 1995); United States v. Daccarett, 6 F.3d 37, 57 (2d Cir. 1993), cert. denied, 114 S. Ct. 1294 (1994). Under CAFRA, however, the United States has the burden of first establishing, by a preponderance of the evidence, that the Defendant property is forfeitable. CAFRA does not, however, in any way limit the right of either party to seek summary judgment. See House Passage of H.R. 1658, Floor Statements, 146 Cong. Rec. H2040-01, 2000 WL 368969 (Cong. Rec.), Proceedings and Debates of the 106th Congress, Second Session, Tuesday, April 11, 2000) ("The bill is not intended to limit the right of either party to bring a motion for summary judgment after the filing of the complaint pursuant to Fed. R. Civ. P. 56(a) or 56(b).").

C.    The Evidence Establishes that the Defendant Vehicle is Forfeitable.

In determining whether property is forfeitable, the United States is entitled to rely on evidence gathered after the Complaint was filed. Title 18, United States Code, Section 983(c)(2) ("the Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture").

The facts as set forth in the statement of the case clearly establish that the Defendant vehicle transported drugs and that it was purchased with the proceeds of illegal drug sales.

D.    There is a Substantial Connection Between the Defendant
      Vehicle and Illegal Drug Sales and Transportation.

Even prior to CAFRA's enactment, many courts applied the "substantial connection" test to civil forfeitures of facilitating property. See, e.g., United States v. One 1986 Ford Pickup, 56 F.3d 1181 (9th Cir. 1995); United States v. Borromeo, 995 F.2d 23 (4th Cir. 1993); United States v. Real Property and Residence at 3097 S.W. 111th Avenue, 921 F.2d 1551 (11th Cir. 1991); United States v. Parcel of Land & Residence at 28 Emery St., 914 F.2d 1 (1st Cir. 1990); United States v. Twelve Thousand Five Hundred and Eighty Five Dollars, 869 F.2d 1093 (8th Cir. 1989). However, as the Fourth Circuit has explained, "The hurdle posed by the 'substantial connection' requirement is not . . . a particularly high one." Borromeo, 995 F.2d at 26. Under this test:

> the property either must be used or intended to be used
> to commit a crime, or must facilitate the commission of
> a crime. At minimum, the property must have more than an
> incidental or fortuitous connection to criminal activity.

United States v. Schifferli, 895 F.2d 987, 990 (4th Cir. 1990); see also United States v. One Parcel Property Located at 7079 Chilton County Road, 123 F.Supp.2d 602, 608 (M.D. Ala. 2000) (finding no requirement that the United States present evidence of a "continuing" illegal activity or "ongoing operation" to show substantial connection).

Here, there is ample evidence of a such a connection between the Defendant vehicle and the offense giving rise to forfeiture.

10

Ricardo Cajero used the Suburban to meet with a confidential informant.

A search warrant was executed at Fountain's residence on May 5, 2006, while she was at the residence. She was aware of the seizure of marijuana and of Mabson's involvement. (See Statement of the Case section C, numbers 3, 4 and 5).

On June 19, 2006, Mabson was arrested while driving the Suburban. (He was arrested on a warrant issued as a result of his federal indictment. (See Statement of the Case section B, parts e and f).

The Suburban smelled strongly of marijuana. Seeds and residue were inside the vehicle and the ashtray held several partially burned marijuana cigarettes. (See Statement of the Case section B, part g).

These facts clearly show that the Suburban was used to facilitate and was intended to be used to facilitate illegal drug activity.


E.    <u>The Defendant Vehicle was Purchased with Drug Proceeds</u>.

Both Fountain and Mabson were involved in the use of nominee or "straw" owners to hide the true ownership of vehicles. (See Statement of the Case section C, numbers 5 and 6). Mabson was the primary user of the Suburban. Neither Fountain or Mabson had

sufficient reported income to allow purchase of the Suburban. (See Statement of the Case section B, parts k and l).

Under these circumstances, the only possible source for the funds used to purchase the Suburban is drug sales.

F.    Claimant Cannot Establish that She is an Innocent Owner.

Under CAFRA, a claimant may defeat a forfeiture by showing that he is an "innocent owner."  Section 983(d) sets forth the requirements of the innocent owner defense, which must be proven by a preponderance of the evidence.  Title 18, United States Code, Section 983(d)(1).  A threshold question is whether the claimant even qualifies as an owner.  Subsection 983(d)(6)(A) defines "owner" as "a person with an ownership interest in the specific property sought to be forfeited, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest."  Subsection 983(d)(6)(B) identifies three specific categories which are not owners:

> (i) a person with only a general unsecured interest in, or claim against, the property or estate of another;
>
> (ii) a bailee unless the bailor is identified and the bailee shows a colorable legitimate interest in the property seized;
>
> (iii) a nominee who exercises no dominion or control over the property.

The Claimant is a mere nominee who lacks dominion and control over the vehicle.  This is demonstrated by Mabson's

extensive use of the vehicle. Failure to establish standing results in summary judgment for the government. United States v. 1990 Chevrolet Silverado Pickup, 804 F. Supp. 777 (W.D.N.C. 1992).

Even if the claimant has standing, she has not shown that she is an "innocent owner". Indeed, the presence of drugs in the vehicle and its extensive use by Mabson, even after Fountain was aware of his drug involvement, precludes any assertion by the claimant that she is innocent.

### CONCLUSION

For all the reasons stated above, the Court should enter judgment in favor of the United States, forfeiting the Defendant vehicle to the United States.

Respectfully submitted this 18th day of May, 2007.

FOR THE UNITED STATES ATTORNEY
LEURA G. CANARY

/s/John T. Harmon
John T. Harmon
Assistant United States Attorney
Bar Number: 7068-II58J
Office of the United States Attorney
Middle District of Alabama
One Court Square, Suite 201 (36104)
Post Office Box 197
Montgomery, Alabama 36101-0197
Telephone:(334) 223-7280
Facsimile:(334) 223-7560
E-mail: John.Harmon@usdoj.gov

13

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 18, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Thomas J. Azar, Jr.**


/s/John T. Harmon
John T. Harmon
Assistant United States Attorney

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE MIDDLE DISTRICT OF ALABAMA

 3                    NORTHERN DIVISION

 4

 5    CIVIL ACTION NUMBER

 6    2:06cv1022-F

 7

 8    UNITED STATES OF AMERICA,

 9         Plaintiff(s),

10    vs.

11    ONE 2001 CHEVROLET SUBURBAN,
      VIN: 3GNEC16TX1G165966,
12    WITH ALL APPURTENANCES
      AND ATTACHMENTS THEREON,
13

14         Defendant(s).

15

16

17

18            DEPOSITION TESTIMONY OF:

19              TARAMESHA FOUNTAIN

20

21    April 2, 2007

22    10 AM

23    SELAH M. DRYER, CSR
```



1        A.      Boyfriend, baby's father.

2        Q.      How long have you been with

3    Mr. Mabson?

4        A.      Four-and-a-half years.

5        Q.      Is Mr. Mabson currently under

6    indictment of which you are aware?

7        A.      No, not anymore.

8        Q.      You say not anymore, what

9    happened?

10       A.      He was indicted on some charges

11   and he got sentenced the last week or the week

12   before last.

13       Q.      Was this a Federal charge or a

14   State charge?

15       A.      Federal charge.

16       Q.      What was the nature of the charge?

17       A.      I want to say possession.

18       Q.      Of what?

19       A.      Controlled substances.

20       Q.      Were you present when he was

21   sentenced?

22       A.      Yeah, I went there to the

23   sentencing.

```
 1          Q.      How much time did Mr. Mabson get?
 2          A.      I want to say a hundred and twenty
 3    months.
 4          Q.      Do you know a man named Kenneth
 5    Gray?
 6          A.      Uh-huh.
 7          Q.      What is your relationship with
 8    Mr. Gray?
 9          A.      He's my cousin.
10          Q.      And that's the man from whom you
11    purchased the car?
12          A.      Uh-huh.
13          Q.      Is he like your first cousin?
14          A.      No, because he didn't give me
15    anything free.  He's on down the line.  My mamma
16    daddy-something, I don't want to tell you no
17    lie, my mamma daddy-something, but he's related.
18          Q.      How about a man named Melvin Hale,
19    H-A-L-E, also known as Rosco?
20          A.      Oh, huh-uh.
21          Q.      Do you know a man name Horjea
22    Villareal, and that's spelled V-I-L-L-A-R-E-A-L?
23          A.      Huh-uh.
```

```
 1          Q.      A man named Tarsus Lanier?

 2          A.      I remember a Tarsus Lanier from

 3     Tavaris Mabson.

 4          Q.      How do you know Mr. Lanier?

 5          A.      Him and Tavaris used to live in

 6     the same neighborhood when I first met Tavaris.

 7          Q.      How about a man named Granthum

 8     Pickett, P-I-C-K-E-T-T?

 9          A.      Huh-uh.

10          Q.      A man named Shar, S-H-A-R, Farius,

11     F-A-R-I-U-S, Nash?

12          A.      No, sir.

13          Q.      A man named Nathaniel Lane?

14          A.      No, sir.

15          Q.      Or Victor Moss?

16          A.      No, sir.

17          Q.      I want to ask you about some

18     addresses, too, Ms. Fountain.

19          A.      Okay.

20          Q.      Have you ever been to an address

21     in Montgomery of 2000 Green Acres Drive?

22          A.      Yes, I have.

23          Q.      Did you live there?
```

1        Q.     That would be 2006?

2        A.     Uh-huh.

3        Q.     Can you tell me what happened on

4    the day, that occurred when he was arrested?

5        A.     I came home from work -- went to

6    Zaxby's, the Dollar Store, came home, took a

7    shower 'cause I had to be at work that next

8    Saturday -- and usually when I work on the

9    weekends I come home and go straight to bed.  I

10   went to bed.  Tavaris came there and said he was

11   going out, changed clothes and left.  And I'll

12   say about twelve o'clock I woke up and checked

13   on my little ones, and the little baby was out

14   of cereal.  So I said I'm going to run across

15   the street to Bruno's 'cause where we live at

16   the store is right across the street -- and I

17   told his brother, I'm going to run to the store

18   and I'll be right back.  So as I was leaving our

19   garage a truck pulled up and like blocked me in

20   and another truck came and blocked me in and

21   they was like hold up ma'am, don't move.  And I

22   was like what I did do?  And he was like -- we

23   just want to talk to you for a minute.  And I

1    was like for what?  And they was like we just

2    got some questions to ask you, just calm down.

3    And I got out of the truck and he asked me what

4    my name was and I told him.  Asked me where have

5    I been all day and I told him to work, the

6    Dollar Store, Zaxby's and back at home.  He

7    asked me did I know anybody who had been to our

8    house that day and I told him no, because I had

9    been at work all day.  I was like, I work from

10   six-thirty in the morning until five o'clock in

11   the afternoon.  So he was like, do you know

12   Tavaris Mabson -- and I was like of course,

13   that's my boyfriend.  And then he was like well,

14   we just picked him up.  Then he was like -- what

15   else did he ask me -- he asked me did I have any

16   weapons on me and I told him no.  He asked me

17   can he see my purse, and I said yeah.  I gave

18   him my purse, checked my purse, wasn't nothing

19   in there.  He's like, where are you going?  I

20   was like I'm going to the store across the

21   street to get some cereal for the baby.  And he

22   was like well okay then, he was like you sure

23   anybody haven't been to your house today?  And I

1   was like no, sir, because I said I've been at

2   work all day long.  And he's like well, we are

3   going to have to search your house, and I said

4   okay, go ahead.  And he said is there anybody in

5   the house, and I said just my two kids.  And

6   then he was like well, can I have your keys --

7   and I was sure I said the alarm is on -- I said

8   y'all at least let me walk in because I said my

9   son is going to see your face all covered up and

10   it might scare him a little bit.  So I unlocked

11   the door and I turned the alarm off and I let

12   them in.

13        Q.    I thought you said, and I took it

14   to be Mr. Mabson's brother was present when you

15   left?

16        A.    Huh-uh.

17        Q.    Who was present?

18        A.    Just my twelve-year-old and my

19   baby, that's all was there and me.

20        Q.    How old was your oldest son at

21   that time?

22        A.    Twelve.

23        Q.    He was twelve at that time?

1    A.    Uh-huh.

2    Q.    Was he awake?

3    A.    He was eleven because he just

4    turned -- he just had a birthday -- yeah, he was

5    awoke.

6    Q.    What time of day was this?

7    A.    It happened like eleven-forty or

8    eleven-thirty, something like that.  It was

9    before twelve o'clock, I know that.

10    Q.    Was it at night or in the daytime?

11    A.    At nighttime.

12    Q.    Did in fact the authorities search

13    the house there at 2000 Green Acres?

14    A.    Yes, they did.

15    Q.    Did they show you anything that

16    they recovered during this search?

17    A.    No.  They left a piece of paper, I

18    know it, 'cause I was sitting in the den and

19    they left a piece of paper of everything that

20    they recovered.  They asked me to sign the piece

21    of paper before they left.

22    Q.    Do you remember what they told you

23    that they found -- excuse me --

1      A.      They didn't tell --
2      Q.      I asked that wrong.  Let me
3   rephrase it.  Did you take a look at what they
4   gave you regarding what they had seized in the
5   execution of the warrant the document that they
6   gave you?
7      A.      Yeah, I looked at the yellow sheet
8   of paper that they had left on the table.
9      Q.      What did it show that they had
10  seized?
11     A.      It said they had guns, money, an
12  ID, packages of marijuana -- and what else --
13  guns, package of marijuana, an ID and
14  photographs of Tavaris Mabson, and that's all I
15  can remember right now.
16     Q.      Did you know that there was
17  marijuana in the house when the police came?
18     A.      No, I didn't.
19     Q.      Did the paper they gave you
20  reflect the location?
21     A.      Yeah, they told me where they
22  found it in the truck of the car inside the
23  garage.  Tavaris had a Miami Hurricane Caprice

1    at that time and it was found in the trunk of
2    that car.
3         Q.    Who had that?
4         A.    It was in the trunk of that car.
5         Q.    That was a car, where was that
6    located?
7         A.    In the garage of 2000 Green Acres
8    Drive.
9         Q.    Who owned that car?
10        A.    Tavaris Mabson.
11        Q.    Had you ever driven that car?
12        A.    I drove it one time when he first
13   got it painted -- and that was it 'cause it sit
14   up too high, too shaky.
15        Q.    If the authorities said they
16   seized about a pound of marijuana from the
17   house, would you deny that?
18        A.    I seen it on the table, so I can't
19   say -- 'cause I seen the stuff on the table when
20   they was putting it on scales and stuff when I
21   was sitting in the den at the time when they
22   searching, so I can't say that they did.
23        Q.    You can't say they --

1   went to work the next day.  I called -- I went

2   and got my dad so he could stay there with the

3   kids, and I went on to work the next day because

4   I had to be at work.

5        Q.    Had you talked to Mr. Mabson about

6   the events of that day?

7        A.    No, I couldn't talk to him until

8   like -- he didn't call me until like after that

9   Saturday until he got all booked up and stuff.

10  I didn't talk to him like Saturday afternoon or

11  something.

12       Q.    What did he tell you about the

13  events?

14       A.    He just said he was sorry that he

15  had it in his car and stuff, and he didn't mean

16  to have that in there.

17       Q.    If the police said they also

18  seized a digital scale from the 2000 Green Acres

19  Drive location, were you aware that that scale

20  was in the house?

21       A.    I wasn't aware of none of that was

22  in the house.  We had a -- the way our house was

23  made, I mean, that's what I was trying to

```
1    little gas-saver for me driving way to Hyundai,
2    yeah.
3         Q.    When did you buy that?
4         A.    I bought that like right before I
5    got that truck.  I want to say in probably in
6    2005-4, something like that.
7         Q.    How much did you pay for that?
8         A.    I only paid like five hundred
9    dollars for that, I think.
10        Q.    For a 1994 Ford Escort you paid
11   five hundred?
12        A.    I think five.
13        Q.    Where did you buy it?
14        A.    I bought it from a lady in
15   Westgate.
16        Q.    Where was that vehicle kept?
17        A.    In our yard, it broke down so I
18   ain't never got it fixed.
19        Q.    But you don't know anything about
20   a 2003 Tahoe?
21        A.    My sister got one, but it ain't
22   mine.
23        Q.    If it was in your name, would that
```

1    surprise you?

2        A.    It was in my name -- her and her

3    husband had complications at that time, so when

4    they got their divorce it was like that so he

5    couldn't get it -- but it's back in her name

6    now.

7        Q.    When did it change over to your

8    sister's name?

9        A.    Let me see.  I want to say 2005,

10    sometime like in there.

11        Q.    How did you do that?  What did you

12    do?

13        A.    Just signed -- when she came,

14    signed the bill of sale over to her like I sold

15    it to her.

16        Q.    And the 2002 Chevrolet Impala,

17    that's the one you told me you sold?

18        A.    Uh-huh.  They didn't even change

19    that in the system until like after all of this

20    happened and I had to call and try -- when I

21    tried to get some information pertaining to that

22    car to let them know that I don't own that car

23    no more -- why is it still in my name, that's

```
 1           A.    Huh-uh, just plain ol' Jane.
 2           Q.    How about tires or rims?
 3           A.    No rims.
 4           Q.    Who drove the Suburban?
 5           A.    I did.
 6           Q.    Were you the only one that drove
 7   it?
 8           A.    I let Tavaris use it.  I let
 9   him -- I went home and took it to him that day,
10   and that day he supposed to pick me up from
11   work -- I ain't seen him no more.  I took it
12   home on my lunch break one day, that same day,
13   June the 20th.
14           Q.    June the 20th?
15           A.    Uh-huh, day after Father's Day.
16           Q.    How often did Mr. Mabson drive it?
17           A.    I let him use it, but often.  The
18   only time I let him use it 'cause he ain't be
19   wanting to drive his car, the Miami Hurricane,
20   the Caprice that was in our garage.  I let him
21   use it, now I do for taking my child -- like
22   when I first had my baby -- definite like in
23   February and March take the baby back and forth
```

1  from my grandmamma's house 'cause his car didn't
2  have no air condition or no heat in it, and I
3  didn't want my baby riding in no car without no
4  air condition or heat in it.
5       Q.    So you got that vehicle sometime
6  between, I think, February 3rd of 2006 and say
7  the 13th of that?
8       A.    I had it before February 13th
9  'cause I went into the hospital and I remember I
10 had it.
11      Q.    Some time between there?
12      A.    Uh-huh.
13      Q.    From then until the day that it
14 was seized, how many times did Mr. Mabson drive
15 it?
16      A.    Not that much, because he always
17 stayed in the rental car.  I'll say probably
18 about -- at the most times, probably about 20
19 times since I had it.
20      Q.    What were the reasons why he would
21 take it, was that always to take your son --
22      A.    Take my baby to my grandmamma's
23 house in the morning time.

1          Q.      How long would he keep it when he
2     did that?
3          A.      See, I be at work.  He'll drop me
4     off at work and come back home and take the baby
5     to work and pick me up when I get off work --
6     and when I get of work, I get it back.
7          Q.      Did he ever let anyone else drive
8     it?
9          A.      Not that I know of.
10         Q.      Did you tell him not to let anyone
11    drive it?
12         A.      Yes, never.  Don't smoke in my
13    truck or lend my truck out, period.
14         Q.      Did you ever smell any strange
15    odors in the Suburban?
16         A.      I never smelled no strange odors,
17    never.
18         Q.      So if the police said they could
19    detect a strong odor of marijuana coming from
20    the Tahoe, they were incorrect?
21         A.      Incorrect.  Probably on Tavaris'
22    clothes 'cause sometimes when he picks me up I
23    can smell it all on his clothes, but not in my

1    truck.  You know you can tell because leather --

2    you can smell stuff -- I don't play that in my

3    truck.

4         Q.    But you could smell marijuana on

5    Tavaris when he came --

6         A.    I can tell he been smoking and I

7    check for ashes and my ashtrays always be clean,

8    because that's the first thing I check for.  I

9    be searching to see if he'd been smoking, I

10   check for my ashtrays and all on my carpet for

11   stuff.  I always do that every time I lend it

12   out to him.

13        Q.    So you were aware that Mr. Mabson

14   smoked marijuana?

15        A.    Yes, I was aware that he smoked

16   marijuana.

17        Q.    Were you aware that Mr. Mabson

18   sold marijuana?

19        A.    No, I wasn't aware that he sold

20   marijuana.

21        Q.    What did Mr. Mabson contribute to

22   your household budget?

23        A.    We'll go half-and-half, never

1   whole, half-and-half.

2          Q.      What did you understand Mr. Mabson

3   did to make his money?

4          A.      Cutting grass.

5          Q.      Did you ever see him cut grass?

6          A.      I never seen him cut grass, but he

7   always come home all worked up dirty in his

8   little suit, you can tell he'd been doing

9   something dirty.

10         Q.      You say he wears a suit?

11         A.      Yeah, his little uniform that he

12  has.

13         Q.      How did you two pool your money to

14  pay your bills?

15         A.      At the first of the month, he'll

16  have his and I'll have mine, we go half-and-

17  half.

18         Q.      Would you deal in cash or would it

19  be a check?

20         A.      Well, Tavaris would give me his

21  half of the money in cash.

22         Q.      How much money did Tavaris give

23  you at the first of every month?

1        Q.    That's his name?

2        A.    Nickname, Big.

3        Q.    I want to go back real briefly to

4  the execution of the warrant.  Did any officers

5  put their hands on you or do anything to you

6  physically during the execution of the warrant?

7        A.    No, sir.

8        Q.    Were you struck or mistreated in

9  any way during the execution of the warrant?

10       A.    No, sir.

11       Q.    Were either of your children hurt

12  or struck or mistreated during the execution of

13  the warrant?

14       A.    No, sir.

15       Q.    The officers found a pistol, a

16  .22-caliber pistol, a .357 caliber revolver, and

17  a Ruger .22-caliber revolver and ammunition in

18  the house.  Were you aware that these weapons

19  were in the house?

20       A.    Huh-uh.

21       Q.    You never had seen those?

22       A.    Huh-uh, and they went straight to

23  his drawer.  He's got his own drawers and his

1  own closet and I don't go in his stuff.  We had

2  separate closets.

3       Q.    Where was the closet where these

4  weapons were recovered?

5       A.    Those guns they said they got them

6  out of the dresser drawer, his drawers, his sock

7  drawer.

8       Q.    Where was that located, what room?

9       A.    The master bedroom.

10       Q.    Did you and Mr. Mabson occupy the

11  master bedroom together?

12       A.    Yes, we did.

13       Q.    How many closets were in the

14  master bedroom?

15       A.    Two.

16       Q.    Did you have a closet and he have

17  a closet?

18       A.    Yes, sir.

19       Q.    I think you indicated that

20  Mr. Mabson owned the Chevrolet Caprice in which

21  the marijuana was recovered?

22       A.    Uh-huh.

23       Q.    Do you know an individual named

1   Kendrick Houston?

2        A.    Yes, I do, Tavaris' cousin.

3        Q.    If the vehicle was registered to

4   Mr. Houston, would that surprise you?

5        A.    Yeah, after -- when I found out --

6   when I seen where everything boiled down to and

7   I seen -- Tavaris ain't had no license.

8        Q.    Mr. Mabson doesn't have a driver's

9   license?

10       A.    He don't have a license.

11       Q.    How long has he been without a

12  license?

13       A.    I don't know.  I met him like

14  four-and-a-half -- I don't know.

15       Q.    Did he have a license when you met

16  him?

17       A.    I don't know.

18       Q.    But even though he didn't have a

19  license, you allowed him to drive --

20       A.    The truck --

21       Q.    The Suburban.

22       A.    Yes, I did.

23       Q.    How many bedrooms are in the house

1    at 2000 Green Acres?

2         A.    Three.

3         Q.    And you indicated of course there

4    was the master bedroom that you and Mr. Mabson

5    occupied, is that correct?

6         A.    Uh-huh, correct.

7         Q.    How about the other bedrooms, who

8    occupied the others?

9         A.    My twelve-year-old son had a room

10   and I had a nursery.  I did a nursery for my

11   son, my newborn baby.

12        Q.    Did that take up all three

13   bedrooms?

14        A.    Uh-huh.

15        Q.    How about the back, right bedroom,

16   who stayed there?

17        A.    Back right, that's my son's room.

18        Q.    Could you explain then why the

19   police said they looked in the right drawer of

20   the desk there and found the driver's license

21   assigned to Mr. Cajero there?

22        A.    That's why -- I don't know -- I

23   don't understand that, that's crazy right there.

1        Q.    How about the fact that four

2    thousand nine hundred and sixty-two dollars was

3    recovered from that --

4        A.    That's crazy, too, 'cause if that

5    was in there I would have got that money.

6        Q.    So you don't know anything about

7    either one of those?

8        A.    I don't know anything about that.

9        Q.    And you never have met anybody

10   named Cajero?

11       A.    No, sir.

12       Q.    Who maintained the Tahoe?

13       A.    The truck?

14       Q.    I'm sorry, the truck, the

15   Suburban, I'm sorry, the defendant vehicle.  Who

16   maintained it?

17       A.    I did.  I just had got it, so

18   there wasn't nothing wrong with it.  I put gas

19   in it and keep it washed, I did.

20       Q.    You didn't have to change the oil,

21   for example?

22       A.    Yeah, I changed the oil.  It was

23   only forty, thirty-nine dollars for an oil